# IN THE SUPREME COURT OF TEXAS

No. 17-1003

BRAZOS ELECTRIC POWER COOPERATIVE, INC., PETITIONER,

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND RICHARD A. HYDE,
EXECUTIVE DIRECTOR OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS

**Argued January 24, 2019**

JUSTICE LEHRMANN delivered the opinion of the Court.

At issue in this case is whether Texas Tax Code Section 11.31 gives the Texas Commission on Environmental Quality discretion to deny an ad valorem tax exemption for heat recovery steam generators, devices the Legislature has deemed "pollution control property." The court of appeals held that the Commission does have that discretion. We disagree; thus, we reverse the court of appeals' judgment and remand the case to the Commission for further proceedings consistent with this opinion.

# I. BACKGROUND

Because this case involves tax exemptions for a particular type of property, we begin with a description of the property at issue—heat recovery steam generators—and the statutory framework governing pollution-control-related tax exemptions.

## A. The Property

A heat recovery steam generator, or "HRSG," is a "combined-cycle" method of electricity production that increases power plant efficiency by using waste heat to generate more electricity than a "single-cycle" system. A typical single-cycle facility generates electricity by burning natural gas (or other combustible fuels) in a combustion turbine. This process creates waste heat and produces nitrogen oxides and other pollutants. A HRSG captures some of the waste heat created in the primary cycle and uses it to drive a steam turbine, generating even more electricity.



*Diagram of a Combined-Cycle Plant*[1]



Because a combined-cycle system generates more electricity than a single-cycle system per unit

of fuel consumed, it emits fewer harmful pollutants per unit of electricity produced.

## B. Statutory Framework

### 1. The Exemption: § 11.31(a) & (b)

In 1993, the Texas Constitution was amended to authorize the Legislature to exempt from

ad valorem taxation

> . . . all or part of real and personal property used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution.

---

[1] This diagram is incorporated from the petitioner's brief and is included for background purposes. The Commission does not dispute its accuracy.

TEX. CONST. art VIII, § 1-*l*(a).[2]  The amendment's ratification made effective a statute passed earlier that year providing that "[a] person is entitled to an exemption from taxation of all or part of real and personal property that the person owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution."  TEX. TAX CODE § 11.31(a).[3]  The Legislature defined a "facility, device, or method for the control of air, water, or land pollution" (henceforth referred to as "pollution control property") as:

> Land . . . or any structure, building, installation, excavation, machinery, equipment, or device, and any attachment or addition to or reconstruction, replacement, or improvement of that property, that is used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution.

*Id.* § 11.31(b).  In other words, property whose function, *id.* § 11.31(a), and purpose, *id.* § 11.31(b), are wholly or partly to prevent, monitor, control, or reduce pollution is "pollution control property" and is at least partly exempt from ad valorem taxation.

## 2. The Exemption Process: § 11.31(c), (d), & (e)

To obtain an exemption under Section 11.31, the property owner must first submit an application to the Commission's Executive Director that contains the following information:

> (1) the anticipated environmental benefits from the installation of the facility, device, or method for the control of air, water, or land pollution;
>
> (2) the estimated cost of the pollution control facility, device, or method; and

---

[2] Adopted at the Nov. 2, 1993 election (*see* Tex. H.R.J. Res. 86, § 2, 73d Leg., R.S., 1993 Tex. Gen. Laws 5576).

[3] *See* Act of May 10, 1993, 73d Leg., R.S., ch. 285, §§ 1, 5 (codified at TEX. TAX CODE § 11.31) (act to take effect upon voters' approval of constitutional amendment proposed by House Joint Resolution 86).

(3) the purpose of the installation of such facility, device, or method, and the proportion of the installation that is pollution control property.

*Id.* § 11.31(c). Applications for property whose use is partly productive and partly for pollution control must also "present such financial or other data as the executive director requires by rule" to determine what proportion of the property is used for pollution control. *Id.*

Upon submission of an application, the Executive Director "shall determine if the facility, device, or method is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution"; that is, the Executive Director shall determine if the property is pollution control property. *Id.* § 11.31(d). Subsection (d) further instructs the Executive Director to notify the appraiser for the county where the property is located (1) that the property owner has applied for an exemption and (2) whether and what proportion of the property qualifies. *Id.* The Executive Director's decision is referred to as a "use determination." *See* 30 TEX. ADMIN. CODE § 17.2(11). If the Executive Director determines that the property is used wholly or partly for pollution control (and is thus entitled to an exemption), he issues a "positive use determination";[4] otherwise, he issues a "negative use determination." *See id.* Applicants may appeal a negative use determination to the Commission. TEX. TAX CODE § 11.31(e).

### 3. Standards for Making Exemption Determinations: § 11.31(g) & (h)

In 2001, the Legislature amended Section 11.31 to require the Commission to:

(1) establish specific standards for considering applications for determinations;

(2) be sufficiently specific to ensure that determinations are equal and uniform; and

---

[4] The applicant must provide a copy of a positive use determination to the chief appraiser of the pertinent tax district to obtain the exemption. TEX. TAX CODE § 11.31(i).

(3) allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods or services.

Act of May 22, 2001, 77th Leg., R.S., ch. 881, § 1, 2001 Tex. Gen. Laws 1774, 1775 (codified at TEX. TAX CODE § 11.31(g)). If the property does not meet the established standards, the Executive Director may not determine that the property is pollution control property. TEX. TAX CODE § 11.31(h).

In response to the statutory amendment, the Commission promulgated new rules requiring exempt property to (1) meet the statutory definition of "pollution control property" and (2) comply with the agency's own rules. *See* 26 Tex. Reg. 7420, 7421 (2001), *adopted by* 27 Tex. Reg. 185, 186–87 (2002) (codified at 30 TEX. ADMIN. CODE §§ 17.1–.25). Thus, in addition to showing that the property met the statutory definition of pollution control property, applicants also had to demonstrate that the property satisfied the "requirements of [30 TEX. ADMIN. CODE] § 17.15 and § 17.17." 30 TEX. ADMIN. CODE § 17.4(d) (2002). Those sections established three "tiers" of applications, each tier with its own application rules. *Id.* § 17.15. Tier I rules applied to property on a "Predetermined Equipment List," a list of property types that the Commission had determined to be wholly pollution control property. *Id.* Tier II rules applied to wholly pollution control property that did not appear on the list. *Id.* And Tier III rules applied to pollution control property used partly for production and partly for pollution control. *Id.*

To determine what proportion of pollution control property was entitled to an exemption, Tier III applications were required to include a cost analysis procedure (CAP) calculation. *See id.* § 17.17(a); *see also id.* § 17.2(4) (defining "cost analysis procedure"). The calculation seeks to balance the costs of employing "green" property against the commercial benefits by

6

subtracting from the cost of the green property (Capital Cost New) (1) the cost of comparable "dirty" property (Capital Cost Old) and (2) the value of the marketable product produced over the life of the property (Net Present Value of Marketable Product or NPVMP). *See id.* § 17.17(c). That figure is divided by the Capital Cost New to determine what percentage of the property is installed purely for pollution control purposes. *Id.* If the formula produces a positive number, the Executive Director issues a positive use determination and the applicant is entitled to an exemption; if the formula's result is zero or negative, the Executive Director issues a negative use determination and the applicant receives no exemption. *See id.* § 17.17(d).

### 4. K-list property: § 11.31(k), (*l*), & (m)

In 2007, the Legislature amended Section 11.31 to add Subsection (k), which directs the Commission to "adopt rules establishing a nonexclusive list of facilities, devices, or methods for the control of air, water, or land pollution, which must include" HRSGs, among other devices. Act of May 28, 2007, 80th Leg., R.S., ch. 1277, § 4, 2007 Tex. Gen. Laws 4261, 4264 (codified at TEX. TAX CODE § 11.31(k)). The parties refer to Subsection (k)'s list of qualifying property as "the k-list."

The amendment also added Subsection (m), which modifies the exemption application process for k-list property in three ways. First, it allows k-list applications to omit the description of the property's environmental benefits that is otherwise required by Subsection (c)(1). *See* TEX. TAX CODE § 11.31(m). Second, it expedites the application process by requiring the Executive Director to issue a determination within thirty days after an application is complete. *Id.* Third, it provides that if the property at issue is k-list property, the Executive Director

> shall determine that the facility, device, or method described in the application is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution and shall take the actions that are required by Subsection (d) in the event such a determination is made.

*Id.* Finally, Subsection (*l*) directs the Commission to "update the [k-list] at least once every three years" and provides that "[a]n item may be removed from the list if the commission finds compelling evidence to support the conclusion that the item does not provide pollution control benefits." *Id.* § 11.31(*l*).

In response to the 2007 statutory amendments, the Commission again amended its rules. *See* 32 Tex. Reg. 6979, 6982–85 (2007), *adopted by* 33 Tex. Reg. 932, 941–43 (2008) (codified at 30 TEX. ADMIN. CODE §§ 17.1–.20). First, the agency modified the Predetermined Equipment List to include two parts: Part A, listing predetermined Tier I property (i.e., wholly pollution control property), and Part B, listing each k-list category. *See* 30 TEX. ADMIN. CODE § 17.14(a) (2008). The list was renamed more generally the Equipment and Categories List. *See id.* The Commission also established a new review tier—Tier IV—which applied exclusively to k-list property. *See id.* § 17.2(16). Tier IV applicants were not required to use the CAP formula and were instead permitted to submit their own methods for calculating the proportion of k-list property used for pollution control, subject to the Executive Director's approval. *See id.* § 17.17(d). Tier IV review led to a significant number of 100% positive use determinations for k-list property and several appeals by county appraisers. *See Freestone Power Generation, LLC v. Tex. Comm'n on Envtl. Quality*, 564 S.W.3d 1, 8 (Tex. App.—Austin 2017), *aff'd*, ___ S.W.3d ___ (Tex. 2019).

Responding to the controversy, the Legislative Budget Board recommended that the Legislature amend the statute to set the maximum exemption amount no higher than the amount

8

produced using the CAP formula. Tex. Leg. Budget Bd., *Texas State Government Effectiveness and Efficiency: Selected Issues and Recommendations* at 109 (Jan. 2009). The Legislature amended the statute in 2009 to add Subsection (g-1), which provides that "[t]he standards and methods for making a determination under this section that are established in the rules adopted under Subsection (g) apply uniformly to all applications for determinations under this section, including applications relating to [k-list property]." Act of May 25, 2009, 81st Leg., R.S., ch. 962, §§ 3, 5–6, 2009 Tex. Gen. Laws 2556, 2557–58 (codified at TEX. TAX CODE § 11.31(g-1)). The Commission interpreted this amendment to require that k-list property be evaluated using the CAP formula like any other application for dual-use property. 35 Tex. Reg. 6255, 6255 (2010). It thus amended its rules to abandon Tier IV review for k-list property and instead require k-list applicants to apply using Tier III rules. *Id.* at 6260, *adopted by* 35 Tex. Reg. 10964, 10969–70 (2010) (codified at 30 TEX. ADMIN. CODE §§ 17.2–17.25). Although the statutory amendment went into effect on September 1, 2009, all applications filed on or after January 1, 2009, for which decisions were not finalized before the amendment's effective date were subject to the new rule. 2009 Tex. Gen. Laws at 2558.

### C. Factual Background and Procedural History

In April 2009, Brazos Electric applied for an exemption under Tier IV, seeking a 100% positive use determination for the HRSG used in its Johnson County facility. The following month, the Executive Director informed Brazos Electric its application had been put on hold pending the resolution of the county appraisers' appeals regarding Tier IV use determinations. And in September 2009, the Executive Director informed Brazos Electric that because its application was filed after January 1, 2009, it was subject to the rules that would be promulgated

in light of Subsection (g-1). After this letter, no activity appears in the administrative record until March 2012, when Brazos Electric submitted a revised application for its Johnson County facility and a new, independent application for its Jack County facility, which also employs HRSGs. Both applications cited environmental regulations that the HRSGs were installed to meet or exceed. And both applications applied the CAP formula, using values for Capital Cost New, Capital Cost Old, and NPVMP that produced positive numbers which, if accepted, would result in positive use determinations—60.73% for the Johnson County facility and 74.66% for the Jack County facility.

In July 2012, the Executive Director issued negative use determinations for the applications on the grounds that "[h]eat recovery steam generators are used solely for production; therefore, are [sic] not eligible for a positive use determination." Brazos Electric appealed the negative use determinations to the Commission, which docketed them along with twelve other appeals by HRSG owners. The Commission set aside the Executive Director's negative use determinations and remanded the cases for new determinations.

The Executive Director subsequently issued notices of deficiency regarding the variables Brazos Electric proposed for use in the CAP calculation with respect to both of its facilities. For the Johnson County facility, the Executive Director proposed variables that produced a result of –82.55%. And for the Jack County facility, the Executive Director proposed variables that produced a result of –277.5%.

10

Brazos Electric contested the Executive Director's proposed variables and resubmitted its applications.[5]  The Executive Director issued negative use determinations for the facilities utilizing the CAP formula and the Director's proposed variables.  Brazos Electric appealed to the Commission, which affirmed the Executive Director's determinations as to both facilities.  Brazos Electric sought judicial review in Travis County district court, which consolidated the cases and affirmed the determinations.  Brazos Electric appealed, and we transferred the appeal from the Third Court of Appeals to the Eighth Court of Appeals pursuant to our docket equalization authority.

While the appeal was pending, the Third Court of Appeals issued its opinion in *Freestone*, reversing the trial court's affirmance of the Commission's negative use determinations in a similar case involving HRSGs, and holding that k-list property cannot be determined to be 100% non-pollution-control property because Section 11.31 defines k-list property as at least "partly" pollution control property.  564 S.W.3d at 15.  Two months later, notwithstanding this precedent from the Third Court, the Eighth Court of Appeals affirmed the trial court's judgment in this case in a divided opinion.  538 S.W.3d 666 (Tex. App.—El Paso 2017).  The dissent argued that the court should have applied the Third Court's precedent,[6]

---

[5] The value of the Capital Cost Old variable was the parties' primary sticking point.  Capital Cost Old is the "cost of comparable equipment or process without the pollution control."  30 TEX. ADMIN. CODE § 17.17(c)(1). Commission regulations state that "[i]f comparable equipment without the pollution control feature is on the market in the United States, then an average market price of the most recent generation of technology must be used."  *Id.*  In making its negative use determinations, the Executive Director used as Capital Cost Old the cost of a new boiler system that produces the same amount of steam as that produced by a HRSG.  Brazos Electric, in turn, proposed a figure of $150,000—the cost of the piping that, if not for the HRSG, would carry the exhaust produced by the primary gas turbine system to the exhaust stack.

[6] Under the Texas Rules of Appellate Procedure, a court of appeals to whom an appeal has been transferred "must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court."  TEX. R. APP. P. 41.3.  A comment to the rule explains that it "requires the transferee court to 'stand in the shoes' of the

11

which in any event was correct on the merits. *Id.* at 724 (Palafox, J., dissenting). We granted Brazos Electric's petition for review.

## II. DISCUSSION

Brazos Electric presents three issues for our review, arguing that: (1) Section 11.31 requires a positive use determination for HRSGs; (2) the Commission cannot categorically treat HRSGs as non-exempt without formally removing them from the k-list by using its Subsection (*l*) authority; and (3) the manner in which the Commission applied the CAP formula to the HRSGs is an abuse of discretion. We agree that Section 11.31 mandates a positive use determination for HRSGs and thus do not reach Brazos Electric's second and third issues.

### A. Standard of Review and Rules of Construction

A proceeding under Section 11.31 is not considered a "contested case" for purposes of the Administrative Procedure Act and its corresponding substantial evidence standard of review. TEX. TAX CODE § 11.31(e); TEX. GOV'T CODE § 2001.174. And although the Water Code allows parties affected by Commission decisions to seek judicial review of those decisions, the

transferor court so that an appellate transfer will not produce a different outcome, based on application of substantive law, than would have resulted had the case not been transferred." TEX. R. APP. P. 41.3 cmt. The Eighth Court concluded that *Freestone* was not binding because a motion for rehearing remained pending in that case as of the date of issuance. 538 S.W.3d at 684 n.14. Though it does not affect the outcome of this case, we disagree with that conclusion, as "the fact that a petition for rehearing is pending in another case does not change the status of [an opinion] as binding precedent." *United States v. Espinosa*, 327 F. App'x 848, 850 (11th Cir. 2009). Certainly we would expect the courts of appeals to treat our opinions as binding precedent even while a motion for rehearing is pending, and that expectation does not change when the binding precedent comes from another panel (or an en banc decision) of the same court of appeals. *See Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964) ("After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties."); *see also Perez v. State*, 495 S.W.3d 374, 391–92 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (affirming *stare decisis* principle that a trial court may not decide cases contrary to the opinion of an appellate court within its jurisdiction on the same question, even while a petition for discretionary review of that decision is pending); *Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp.*, 309 S.W.3d 619, 630 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("Absent a decision from a higher court or this court sitting en banc that is on point and contrary to the prior panel decision or an intervening and material change in the statutory law, this court is bound by the prior holding of another panel of this court.").

authorizing statute does not specify the standard of review. *See* TEX. WATER CODE § 5.351. Under these circumstances, we review the Commission's decision for an abuse of discretion. *See Tex. Comm'n on Envtl. Quality v. City of Waco*, 413 S.W.3d 409, 423–25 (Tex. 2013) (applying abuse of discretion standard in reviewing Commission's decision to deny a contested case hearing, where the decision was not itself the product of a contested case hearing and the relevant statutes did not specify a standard of review). The Commission abuses its discretion "by failing to analyze or apply the law correctly." *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

Further, the primary issue presented is one of statutory interpretation, which we consider de novo even when reviewing agency decisions. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017). Our objective in statutory construction is to give effect to the Legislature's intent, "which we ascertain from the plain meaning of the words used in the statute" because the best indicator of what the Legislature intended is what it enacted. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016); *see also Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013). Thus, "[w]here text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). We presume lawmakers chose statutory language "with care and that every word or phrase was used with a purpose in mind." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). We read these words and phrases in context and construe them according to the rules of grammar and common usage. TEX. GOV'T CODE § 311.011; *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("Undefined terms in a statute are typically given their ordinary meaning [unless] a different or more precise definition is apparent from the term's use in the context of the

13

statute . . . ."). Importantly, we do not consider those words and phrases in isolation; rather, "we consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage." *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016). Moreover, "[s]tatutory terms should be interpreted consistently in every part of an act." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Finally, we presume that the Legislature intended the statute to comply with the Texas Constitution. TEX. GOV'T CODE § 311.021(1); *In re Allcat Serv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011) (orig. proceeding).

We have also explained that we construe statutory exemptions from taxation strictly "because they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally." *N. Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991). Thus, all doubts are resolved against the granting of an exemption. *See id.* But while "a plain-meaning determination should not disregard the economic realities underlying the transactions in issue," *Roark Amusement*, 422 S.W.3d at 637, courts are not authorized to read in an entirely new requirement "in the guise of considering the economic realities or essence of the transaction," *Combs v. Health Servs. Corp.*, 401 S.W.3d 623, 627 n.8 (Tex. 2013).

Finally, we have recognized that an agency's interpretation of a statute is entitled to "serious consideration." *TGS-NOPEC Geophysical Co.*, 340 S.W.3d at 438. But "deferring to an agency's construction is appropriate only when the statutory language is ambiguous." *Sw. Royalties*, 500 S.W.3d at 405 (emphasis omitted). Otherwise, agency deference "has no place." *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013).

14

**B. Analysis**

The plain meaning of Section 11.31 is clear: property that qualifies in whole or in part as pollution control property is entitled to a tax exemption, and HRSGs qualify, at least in part, as pollution control property. Thus, assuming the applicant otherwise complies with the statute's requirements, the Executive Director may not issue a negative use determination for HRSGs.

Subsection (a) exempts from taxation "all or part" of real or personal property "used wholly or partly as a facility, device, or method for the control of air, water, or land pollution" (i.e., pollution control property). TEX. TAX CODE § 11.31(a). The Legislature further defines pollution control property in Subsection (b), in accordance with the Texas Constitution, as property "that is used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any [government entity] for the prevention, monitoring, control, or reduction of air, water, or land pollution." *Id.* § 11.31(b); *see also* TEX. CONST. art VIII, § 1-*l*(a). To administer this exemption, the Executive Director is required to answer two related questions:

> Following submission of the information required by Subsection (c), the executive director . . . shall determine if the [property] is [pollution control property] . . . . The executive director shall issue a letter . . . stating the . . . determination of *whether* the [property] is used wholly or partly to control pollution and, if applicable, *the proportion* of the property that is pollution control property.

TEX. TAX CODE § 11.31(d) (emphasis added). In other words, the Executive Director must determine both *whether* the property is pollution control property and *how much* of it is pollution control property.

The statute generally grants the Executive Director broad discretion to make these determinations. *See id.* § 11.31(d), (g), (g-1). But in 2007, the Legislature modified that grant of discretion by amending Section 11.31 to add Subsections (k), (*l*), and (m). *See* Act of June 15,

15

2007, 80th Leg., R.S., ch. 1277, § 4, 2007 Tex. Gen. Laws 4261, 4264. The effect of these provisions is to curb the Executive Director's discretion as to the first question by creating a list of *per se* pollution control property (the k-list). First, Subsection (k) provides that the Commission "*shall* adopt rules establishing a nonexclusive list of [pollution control property], which *must* include . . . heat recovery steam generators." TEX. TAX CODE § 11.31(k)(8) (emphasis added). Second, applications for exemptions for k-list property are not required to describe the property's "anticipated environmental benefits" as otherwise required by Subsection (c)(1). *Id.* § 11.31(m). Third, the Executive Director "*shall determine that* the [k-list property] is [pollution control property] and shall take the actions that are required in Subsection (d) in the event such a determination is made" (i.e., issue a letter informing the applicant of the determination within 30 days of receiving the application). *Id.* (emphasis added).

In other words, the Legislature has affirmatively designated HRSGs, along with certain other facilities, devices, and methods, as pollution control property and has directed the Commission to "determine *that*" a HRSG is at least partly pollution control property. *Id.* § 11.31(m) (emphasis added). By contrast, with respect to non-k-list property, the Executive Director "shall determine *if* the [property] is [pollution control property]." *Id.* § 11.31(d) (emphasis added). The language of Subsection (m) is mandatory and withdraws the Executive Director's discretion to determine *whether* k-list property is pollution control property because the Legislature has already determined that it is.[7]

---

[7] The Commission argues that Subsection (m), which requires the Executive Director both to "determine that" k-list property is pollution control property and to "take the actions that are required in Subsection (d) in the event such a determination is made," is not so clear. Specifically, the Commission argues that the phrase "in the event such a determination is made" negates the mandatory character of "shall determine that." We disagree. The sentence's structure makes it clear that "in the event such a determination is made" merely modifies "the actions that are required by Subsection (d)," meaning that when the Executive Director determines that k-list property is

For k-list property, then, the Executive Director's sole responsibility is to determine what proportion of the property is purely productive and what proportion is for pollution control. *See id.* ("The executive director shall issue a letter to the [applicant] stating the executive director's determination of . . . the proportion of the property that is pollution control property."). But it may not determine that the pollution control proportion is zero or negative—the Legislature took "zero" off the table when it instructed the Executive Director to determine that k-list property is pollution control property, meaning it is used at least "partly" for pollution control. *Id.* § 11.31(m). "Partly," after all, cannot mean "in no part." Rather, the common, ordinary meaning of "partly" is "in some measure," or "with respect to a part rather than a whole." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1648 (2002). "Part," in turn, means "a unit (as a number, quantity or mass) held to constitute with one or more other units something larger." *Id.* at 1645. Here, the proportion of a HRSG that is pollution control property constitutes, together with the proportion of the HRSG that is productive, a larger quantity: the HRSG's full value. This accords with our jurisprudence, in which we have defined "part" as "one of several . . . units of which something is composed." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011) (alteration in original) (citation and internal quotation marks omitted).

In these terms, the full value of a HRSG is composed of two units: "the proportion of property that is used to control, monitor, prevent, or reduce pollution [and] the proportion of

---

pollution control property, as he is required to do, he must then take the same actions that are required when non-k-list property is determined to be pollution control property. *See* TEX. TAX CODE § 11.31(d) (requiring the Executive Director to issue a letter to the applicant stating his determination and to send a copy of the letter to the chief appraiser of the appropriate appraisal district). The Commission's interpretation is unreasonable because it requires us to read Subsection (m) as simultaneously mandatory and permissive.

property that is used to produce goods or services." TEX. TAX CODE § 11.31(g)(3). As the Third Court of Appeals correctly noted in *Freestone*:

> Property cannot qualify as 100% pollution control property if any portion of its value is attributable to its capacity to produce goods and services. The inverse is also true. The Legislature has mandated that HRSGs are, at least "partly," pollution control property; therefore, they cannot be determined to be 100% non-pollution control property.

564 S.W.3d at 15 (internal citation and quotation marks omitted). There appears to be no dispute that some portion of a HRSG's value is attributable to its production capacity; thus, the Executive Director's discretion is limited to making a use determination that is greater than 0% and less than 100%. It may, of course, issue negative use determinations for Tier III applications for property that is not on the k-list, TEX. TAX CODE § 11.31(d), either because the Legislature chose not to include it on the list in the first instance or because the Commission has formally removed it from the list pursuant to its authority under Subsection (*l*), *see id.* § 11.31(*l*) ("An item may be removed from the list if the commission finds compelling evidence to support the conclusion that the item does not provide pollution control benefits."). The Legislature chose to include HRSGs on the k-list, and the Commission has yet to exercise its Subsection (*l*) authority to remove them. Accordingly, as long as HRSGs remain on the k-list, the agency has no discretion to issue a negative use determination for compliant HRSG applications.

The Commission argues that this holding renders portions of Section 11.31 meaningless, namely Subsections (c), (g)(3), (g-1), and (h). We disagree. Subsection (c) states that the applicant shall present, with respect to property that is used only partly for pollution control, "such financial or other data as the executive director requires by rule for the determination of the proportion of the installation that is pollution control property." *Id.* § 11.31(c).

18

Subsection (g)(3) similarly states that the Commission's rules must "distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of the property that is used to produce goods or services." *Id.* § 11.31(g)(3). Those provisions are consistent with the Commission's continuing duty to determine *how much* of the property at issue is pollution control property, a determination it must still make even after it determines that the device is at least partly pollution control property.

Subsection (g-1), in turn, requires that the Commission's rules "apply uniformly to all applications for determinations under this section, including applications relating to [k-list property]." *Id.* § 11.31(g-1). The Commission contends that it must maintain the discretion to issue negative use determinations in order to uniformly apply the CAP formula to k-list and non-k-list property alike. But our holding does not require the Commission's rules to be applied disparately. We do not opine here on whether the CAP formula is itself problematic or whether it is merely being applied problematically. We hold only that, whatever formula the Commission uses and however it applies that formula, the Commission has no discretion (apart from its authority under Subsection (*l*)) to determine that property on the k-list is not at least partly pollution control property.

Finally, Subsection (h) forbids the Executive Director to determine that property is pollution control property "unless the property meets the standards established under the rules adopted under this section." *Id.* § 11.31(h). However, the rules themselves must comply with the Legislature's statutory directives. *Tex. Catastrophe Prop. Ins. Ass'n v. Council of Co-Owners of Saida II Towers Condo. Ass'n*, 706 S.W.2d 644, 645 (Tex. 1986) ("[T]he Legislature . . . prescribe[s] rules and regulations to govern the administrative body and the

method by which the rights determined by such body will be enforced."), *abrogated on other grounds by Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71 (Tex. 2000). To the extent the Commission enacts or applies its rules regarding pollution control property in a manner that is contrary to or inconsistent with Section 11.31's requirements, the statute must prevail.

The Commission next contends that it must conduct case-by-case determinations for k-list applications pursuant to the 1993 constitutional amendment, which reads:

> The legislature by general law may exempt from ad valorem taxation all or part of real and personal property used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution.

TEX. CONST. art. VIII, § 1-*l*. As noted, Section 11.31 echoes this language by exempting property "that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution," defined as property "that is used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution." TEX. TAX CODE § 11.31(a)–(b). According to the Commission, if the 2007 statutory amendment grants a *per se* exemption for k-list property, the amendment effectively decoupled the statutory definition of exempt property from the constitutional definition with regard to k-list property. Thus, the Commission argues that it must conduct independent constitutional and statutory inquiries for each application. Even if the property satisfies the statutory definition of "pollution control property," the agency says, it might not satisfy the constitutional definition.

20

We agree of course with the general proposition that statutory provisions granting a tax exemption cannot exceed the bounds of the constitutional provision that empowers the Legislature to grant the exemption. *See Dickison v. Woodmen of the World Life Ins. Soc'y*, 280 S.W.2d 315, 317 (Tex. Civ. App.—San Antonio 1955, writ ref'd) (noting that the Legislature "may not broaden [a constitutionally authorized tax exemption] beyond the constitutional confines"); *cf. N. Alamo Water Supply*, 804 S.W.2d at 899 ("Before an organization can be considered for qualification for tax exempt status [under section 11.18 of the Tax Code], that organization must first meet the applicable constitutional requirements which entitle those organizations to seek the exemption."). But the Commission is wrong that Section 11.31 does so. In enacting Subsection (k) and related provisions, the Legislature did not authorize unconstitutional exemptions for k-list property. Instead, it determined that k-list property necessarily meets the statutory definition of pollution control property, which is itself coextensive with the constitutional exemption standard. And the Legislature gave the Commission a mechanism to remove property from that list in the event "compelling evidence . . . support[s] the conclusion that the item does not provide pollution control benefits." TEX. TAX CODE § 11.31(*l*).

Even if we were to accept the Commission's premise—that issuing a positive use determination for all HRSGs would violate the constitution and make it difficult for the Commission to comply with other portions of the statute—the agency's recourse under these circumstances is not to unilaterally ignore the Legislature's clear instructions. As explained, the Legislature itself recognized that the k-list contains categories whose suitability for the list might change over time. Accordingly, it ordered the Commission to "update the list adopted under

21

Subsection (k) at least once every three years," and it authorized the Commission to remove an item "from the list if the commission finds compelling evidence to support the conclusion that the item does not provide pollution control benefits." *Id.* But again, the Commission has not seen fit to remove HRSGs from the k-list under subsection (*l*). Until it does, it must follow the Legislature's instructions as enacted.

In sum, we see nothing in Subsection (k) or (m) indicating that the Legislature exceeded its constitutional authority to exempt pollution control property from taxation. To the contrary, by providing the subsection (*l*) mechanism for removal of items from the k-list, the Legislature sought to ensure the k-list would not exceed the bounds of the Constitution.

Finally, the Commission argues that our holding will lead to absurd results. What would prevent, it asks, an eccentric billionaire from obtaining an exemption after purchasing a HRSG and burying it in the desert in an apparent homage to Amarillo's *Cadillac Ranch*? *See* Sonia Smith, *Forty Years of the Cadillac Ranch*, TEXAS MONTHLY (June 12, 2014), https://www.texasmonthly.com/travel/forty-years-of-the-cadillac-ranch. Setting aside the questionable appraisal value of delicate and sophisticated equipment buried in the West Texas desert, *see id.*, the statute provides two safeguards against such unmeritorious applications. First, Subsection (c)(3) requires applicants to state "the purpose of the installation of such facility, device, or method," meaning the applicant would essentially have to lie in its application to obtain an exemption. TEX. TAX CODE § 11.31(c)(3); *see* TEX. PENAL CODE § 37.10(a)(1) (establishing an offense for "knowingly mak[ing] a false entry in . . . a governmental record"). Second, as the dissent in the court of appeals noted, Section 11.31 renders ineligible for the exemption "[p]roperty used for residential purposes, or for recreational, park, or scenic uses as

22

defined by Section 23.81."[8]   TEX. TAX CODE § 11.31(a).   We will not engage in a tortured reading of the statute to account for one unlikely hypothetical that, in any event, is adequately addressed when the statutory provisions are viewed as a whole and in context.

### III. CONCLUSION

The Commission abused its discretion in issuing negative use determinations on Brazos Electric's applications for tax exemptions for the HRSGs used in its facilities in Jack and Johnson Counties.   Accordingly, we reverse the court of appeals' judgment and remand the case to the Commission for further proceedings consistent with this opinion.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** May 3, 2019

---

[8] "Recreational, park, or scenic use" is defined as "use for individual or group sporting activities, for park or camping activities, for development of historical, archaeological, or scientific sites, or for the conservation and preservation of scenic areas."  TEX. TAX CODE § 23.81(1).