

KEN PAXTON

ATTORNEY GENERAL OF TEXAS

February 27, 2026

Mr. Darrel D. Spinks
Executive Director
Texas Behavioral Health Executive Council
1801 Congress Avenue, Suite 7.300
Austin, Texas 78701

**Opinion No. KP-0518**

Re: Interpretation of "health care provider" under Tex. Health & Safety Code § 161.701(2) and associated issues (RQ-0605-KP)

Dear Mr. Spinks:

You seek clarification regarding the application of S.B. 14 to "mental health care providers" licensed by the Texas Behavioral Health Executive Council.[1] First, you ask whether the definition of "health care provider," which was codified in subsection 161.701(2) of the Health and Safety Code, encompasses the Council's licensees. Request Letter at 1. If so, you also ask "how" the licensees "are impacted by S.B. 14" in relation to "mental health care services not specifically enumerated."[2] *Id.* at 1–2. We answer both questions in turn.

**The Legislature codified various restrictions on health care providers as well as physicians involved with procedures and treatments afforded to children for gender transitioning, gender reassignment, and gender dysphoria.**

The legislation at the heart of your request relates to procedures and treatments afforded to certain children for gender transitioning, gender reassignment, and gender dysphoria. *See* Act of May 17, 2023, 88th Leg., R.S., ch. 335, 2023 Tex. Gen. Laws 732, 732–36 (current version at TEX. HEALTH & SAFETY CODE §§ 62.151(g), 161.701–.706; TEX. OCC. CODE §§ 164.052(a)(24), .0552;

---

[1] *See* Letter from Darrel D. Spinks, Exec. Dir., Tex. Behav. Health Exec. Council, to Hon. Ken Paxton, Tex. Att'y Gen. at 1–2 (July 2, 2025), https://www.texasattorneygeneral.gov/sites/default/files/request-files/request/2025/RQ0605KP.pdf ("Request Letter").

[2] You also imply that your questions may intersect with the First Amendment, referencing *Chiles v. Salazar*—a case pending before the United States Supreme Court. *See* Request Letter at 2. *See generally Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024), *cert. granted*, 145 S. Ct. 1328 (U.S. Mar. 10, 2025) (No. 24-539). But *Chiles* concerns a statute that is markedly different from the framework at issue in your request and, even were this not the case, we generally decline to answer "question[s] that [are] the subject of pending litigation." Tex. Att'y Gen. Op. No. KP-0468 (2024) at 2. We therefore offer no speculation on the scope of the Court's eventual holding in *Chiles*.

TEX. HUM. RES. CODE § 32.024(rr)). *See generally State v. Loe*, 692 S.W.3d 215, 239 (Tex. 2024) (upholding the statute's constitutionality). It codified what is now subchapter Y in Chapter 161 of the Health and Safety Code, which prohibits the provision of certain procedures and treatments "[f]or the purpose of transitioning a child's biological sex as determined by the sex organs, chromosomes, and endogenous profiles of the child or affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."[3] TEX. HEALTH & SAFETY CODE § 161.702. Both "physician[s]" and "health care provider[s]" are thus prohibited from "knowingly" "perform[ing] a surgery that sterilizes the child," "perform[ing] a mastectomy," or "remov[ing] any otherwise healthy or non-diseased body part or tissue." *Id.* § 161.702(1)–(2), (4). Neither may these individuals "knowingly[] . . . provide, prescribe, administer, or dispense . . . prescription drugs that induce transient or permanent infertility" in children— specifically, "puberty suppression or blocking prescription drugs to stop or delay normal puberty;" "supraphysiologic doses of testosterone to females;" and "supraphysiologic doses of estrogen to males." *Id.* § 161.702(3)(A)–(C). Ultimately, the Attorney General has enforcement authority over ongoing, completed, or threatened violations of these constraints. *Id.* § 161.706(a).

The subchapter also imposes other restrictions related to these prohibited procedures and treatments. For one, it forbids "[p]ublic money" being "directly or indirectly . . . used, granted, paid, or distributed to any health care provider, medical school, hospital, physician, or any other entity, organization, or individual that provides or facilitates the provision of a procedure or treatment to a child that is prohibited under [s]ection 161.702." *Id.* § 161.704. The subchapter also prohibits reimbursements from Medicaid and the child health plan program to health care providers and physicians who provide one of the prohibited procedures or treatments to a child. *Id.* § 161.705; *see also id.* § 62.151(g) (restricting child health plan coverage for "services prohibited by [s]ection 161.702"); TEX. HUM. RES. CODE § 32.024(rr) (same, but for the medical assistance program).

> **The Council's licensees plainly constitute health care providers under subsection 161.701(2), resulting in a bar on all public funds for those who facilitate prohibited procedures—in addition to the longstanding constraints on licensed practice.**

This background frames both your first and second questions: Whether the Council's licensees are "health care provider[s]" under subsection 161.701(2) and, if so, "how such providers are impacted . . . given that the prohibited activities . . . fall outside the scope of practice for mental health professionals." Request Letter at 1–2. Both inquiries require that we "give effect to the Legislature's intent, 'which [is] ascertain[ed] from the plain meaning of the words used in the statute' because the best indicator of what the Legislature intended is what it enacted." *Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Env't Quality*, 576 S.W.3d 374, 383–84 (Tex. 2019) (quoting *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016)). That "plain meaning" is

---

[3] There are limited exceptions to this general prohibition, though none "contemplate continued attempts to transition a child." Tex. Att'y Gen. Op. No. KP-0481 (2025) at 5. One relates to the valid provision of "puberty suppression or blocking prescription drugs for the purpose of normalizing puberty for a minor experiencing precocious puberty," TEX. HEALTH & SAFETY CODE § 161.703(a)(1), and the other generally concerns the provision of prescription drugs as "part of a continuing course of treatment that [a] child began before June 1, 2023," where the child also attended a requisite amount of mental health counseling or psychotherapy sessions "during a period of at least six months before the date the course of treatment . . . began," *id.* § 161.703(b).

"informed by the context in which the enacted text appears." *Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, 715 S.W.3d 383, 387 (Tex. 2025); *accord City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). When terms are left undefined or their meaning is not otherwise "apparent from the statute's language," however, "we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017).

Subsection 161.701(2) broadly defines a "[h]ealth care provider" as "a person other than a physician who is licensed, certified, or otherwise authorized by this state's laws to provide or render health care or to dispense or prescribe a prescription drug in the ordinary course of business or practice of a profession." TEX. HEALTH & SAFETY CODE § 161.701(2); *see also id.* § 161.701(4) (defining "[p]hysician" as "a person licensed to practice medicine in this state"). The phrase "health care" is commonly understood to mean "efforts made to maintain or restore health . . . by trained and licensed professionals." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 574 (11th ed. 2020); *see also, e.g.*, NEW OXFORD AMERICAN DICTIONARY 801 (3d ed. 2010) (referring to "the maintenance and improvement of physical and mental health," including "through the provision of medical services"). Further, the attributive noun "health" ordinarily refers to "physical and mental well-being; freedom from disease, pain, or defect; normalcy of physical and mental functions; [or] soundness." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 669 (5th ed. 2016); *see also, e.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 574 (11th ed. 2020) (emphasizing "the condition of being sound in body, mind, or spirit"); MOSBY'S DICTIONARY OF MEDICINE, NURSING & HEALTH PROFESSIONS 809 (10th ed. 2017) (emphasizing "a condition of physical, mental, and social well-being and the absence of disease or other abnormal condition"). This makes clear that a health care provider engages in licensed efforts to maintain or restore health, whether in body or mind, and belies any perceived ambiguity in subsection 161.701(2).

Nor can there be any question that the Council's licensees—whom you refer to as "mental *health care* providers," Request Letter at 2 (emphasis added)—deal in health care. The framework governing "Health Professions" includes an entire subtitle for "Psychology and Counseling," which individually regulates the services of "Psychologists," "Marriage and Family Therapists," "Licensed Professional Counselors," as well as "Social Workers." *See generally* TEX. OCC. CODE tit. 3, subtit. I, chs. 501–503, 505, §§ 501.001–.603, 502.001–.455, 503.001–.511, 505.001–.603. These professions are unified in offering both "assessment" and "treatment" or "remediation" of various behavioral disorders. *Compare id.* § 501.003(a)(1)(A) (psychology), *with id.* § 502.002(6) (marriage and family therapy), *id.* § 503.003(a) (professional counseling), *and id.* § 505.0025(a)–(b) (social work). Moreover, many of these individuals are elsewhere defined as "[h]ealth care professional[s]," *id.* § 108.051(1)(L)–(M) (listing licensed "psychologist[s]" and "social worker[s]"), and held to be "health care provider[s]" under the Texas Medical Liability Act, *e.g.*, *Fudge v. Wall*, 308 S.W.3d 458, 462 (Tex. App.—Dallas 2010, no pet.) (concluding a professional counselor is "licensed to provide health care"); *accord Mike Norgaard, LPC v. Pingel*, 296 S.W.3d 284, 288 (Tex. App.—Fort Worth 2009, no pet.).

You nonetheless suggest that "mental health care providers are not intended to be encompassed within the scope of S.B. 14" because the prohibited procedures and treatments fall "outside [your licensees'] scope of practice." Request Letter at 2. We disagree. The unambiguous

definition of "health care provider" does not require a prescription pad or scalpel, *see supra* p. 3, and the Council conflates one form of unlawful conduct with a condition of membership in the entire class of health care providers. Critically, S.B. 14 codified more than a prohibition on providing certain surgeries and prescriptions; it also forbade public money from being "directly or indirectly . . . used, granted, paid, or distributed to any health care provider[] . . . that provides *or facilitates* the provision of a procedure or treatment . . . prohibited under [s]ection 161.702." TEX. HEALTH & SAFETY CODE § 161.704 (emphasis added). The undefined term "facilitate," of course, ordinarily means "to make easier" or "to help bring about." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 447 (11th ed. 2020); *accord* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 519 (5th ed. 2016); *see also, e.g.*, Tex. Att'y Gen. Op. No. KP-0401 (2022) at 3 (recognizing counselors as facilitators of medical procedures and treatments). It follows that "any health care provider" who helps bring about a prohibited procedure or treatment—whether provided by a "physician" or another "health care provider,"[4] TEX. HEALTH & SAFETY CODE § 161.702—cannot lawfully receive public funding for that venture. *Id.* § 161.704; *see also* TEX. HUM. RES. CODE § 32.024(rr).

For good reason, too, given that the multidisciplinary path to medically transitioning children often starts with mental "health care." We received several briefs highlighting that mental health professionals serve as the "clinical gatekeepers whose assessments and recommendations initiate the interventions" prohibited by S.B. 14.[5] Likewise, our Legislature acknowledged this unfortunate reality in creating a limited "wean off" period for children on a "course of treatment that . . . began before June 1, 2023" so long as the child also "attended 12 or more sessions of mental health counseling or psychotherapy . . . at least six months before the . . . treatment . . . began."[6] TEX. HEALTH & SAFETY CODE § 161.703(b). Even the World Professional Association for Transgender Health—an organization known to shape its supposed "medical conclusions" with "political interests," *United States v. Skrmetti*, 605 U.S. 495, 543, 546 (2025) (Thomas, J., concurring)—publicly professes that "mental health professional[s]" possess "the most appropriate training and dedicated clinical time to conduct an assessment and elucidate treatment priorities and goals when working with transgender youth[] . . . seeking gender-affirming medical/surgical care." World Professional Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, *Version 8, in* 23 INT'L J. OF TRANSGENDER HEALTH S1, S49–50 (2022) (recommending a "comprehensive biopsychosocial assessment to

---

[4] Advanced Practice Registered Nurses and Physician Assistants, for example, are capable of prescribing drugs used for transitioning a child. *See* TEX. OCC. CODE §§ 157.0511(a), .0512(a). Registered Nurses can also administer the same prohibited prescriptions. *Id.* § 301.002(2)(C); *see also, e.g.*, Tex. Att'y Gen. Op. No. GA-0236 (2004) at 1–2 & n.2 (confirming physicians can "give orders to registered nurses to administer medication"). But the capacity of some is not a requirement for all; these individuals constitute "health care providers" because they are licensed to maintain or restore health. *See supra* p. 3.

[5] Brief from Am. First Pol'y Inst., to Off. of the Tex. Att'y Gen., Op. Comm. at 6–9, 11 (rec'd Aug. 6, 2025) (submitting a brief on behalf of the Association of Mental Health Professionals) (on file with the Op. Comm.); *see also, e.g.*, Brief from Rebecca Smith MA, LPC-S, Counseling Ctr. Of Montgomery Cnty. PLLC, to Off. of the Tex. Att'y Gen., Op. Comm. at 2–4 (Aug. 6, 2025) (on file with the Op. Comm.) (commenting on "[m]ental health providers who write letters recommending medical interventions," like "hormone therapy or surgeries").

[6] As we have previously observed, however, the passage of time belies the continued presence of any children in this category—an "impossibility [that] is only magnified by the fact that the 'wean off' period itself cannot convert what was (and still is) child abuse into the valid, professional provision of . . . care." Tex. Att'y Gen. Op. No. KP-0481 (2025) at 5.

guide treatment decisions and optimize outcomes"). It thus comes as little surprise that the Legislature also made clear a "health care provider" who "facilitates" unlawful efforts to transition a child is no less forbidden from receiving public funds than one who "provides" that service themselves. TEX. HEALTH & SAFETY CODE § 161.704. The power "to answer moral and political questions about childhood transgender therapy" resides with "the sovereign People of Texas . . . through their representatives in the Legislature," *Loe*, 692 S.W.3d at 240 (Blacklock, J., joined by Devine, J., concurring), and that process culminated in a rational conclusion that the risk of transitioning children's sex "was not outweighed by the benefits," *id.* at 234. It is in this sense that the Council's proposed reading obstructs the Legislature's constitutionally "legitimate interest[] . . . in protecting the health and wellbeing of children," *id.* at 233, by inappropriately limiting the financial consequences of facilitation to only those who could have provided the unlawful services themselves.[7] *See generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63–64 (2012) (discussing the "Presumption against Ineffectiveness," which explains "[a] textually permissible interpretation that furthers . . . [the underlying] purpose should be favored" over one that "obstructs").

To be sure, we acknowledge that S.B. 14 also "amend[ed] the licensing act for physicians." Request Letter at 2. Subsection 164.0552(a) of the Occupations Code now makes clear that the provision of a prohibited surgery or prescription is "a 'prohibited practice' that requires revocation of a physician's 'license or other authorization to practice medicine.'" Tex. Att'y Gen. Op. No. KP-0481 (2025) at 4 (citation omitted). But this does not change the plain-text reality discussed above. *See supra* pp. 3–5. If anything, the supplemental constraint on physicians' licenses sits comfortably beside the Council's independent obligation to discipline health care providers who transgress the Occupations Code's profession-specific "chapter[s]" or associated "rule[s]." TEX. OCC. CODE §§ 501.401(1) (psychologists), 502.351(9) (marriage and family therapists), 503.401(a)(1) (licensed professional counselors), 505.451 (social workers); *see also, e.g., id.* § 507.404(2) (requiring that the Council develop a monitoring system for licensees' "compliance with applicable laws and . . . rules" as well as procedures to "identify and monitor each license holder who represents a risk to the public").

Psychologists, for example, are bound by rule to "rely on scientifically and professionally derived knowledge when making professional judgments," 22 TEX. ADMIN. CODE § 465.10; act in their client's best interest, *id.* § 465.13(a)(4); and end the professional relationship if it is reasonably clear that the client "is being harmed by continued service," *id.* § 465.21(c). Other licensees within the Council's ambit are similarly bound to "provide services within accepted professional standards of practice," *id.* § 781.301(3) (social workers); avoid dishonestly representing the "effectiveness of services," *id.* § 681.41(a)(1), (b) (professional counselors); and use therapeutic services that assist with "stabilizing," "alleviating," or "overcom[ing]" a child's underlying "mental, emotional, or behavioral" condition, *id.* § 801.42(3)–(6) (family and marriage therapists). Yet "[a]ny claim to 'consensus' [on transitioning children] in the medical community—never a claim that reflected reality—seems to be crumbling quickly[] . . . on its own terms." *Loe*, 692 S.W.3d at 241 n.5 (Blacklock, J., joined by Devine, J., concurring).

---

[7] It is of no moment that section 161.704 serves as a restriction on providing, as opposed to merely receiving, public funds because the Council's reading would vitiate that prohibition altogether.

"Myriad entities . . . around the world have conducted systematic reviews of the 'science' behind [medically transitioning] . . . children with gender dysphoria and universally concluded that the putative evidence behind this abusive practice is non-existent." Tex. Att'y Gen. Op. No. KP-0481 (2025) at 4 n.4 (collecting sources); *accord Skrmetti*, 605 U.S. at 505 (collecting accounts from Finland, England, Sweden, and Norway); *see also, e.g.*, Tex. Att'y Gen. Op. No. KP-0401 (2022) at 2–6 (describing the risks associated with these supposed procedures and treatments). The available "[e]vidence does not support the notion that 'affirmative care' of today's adolescents is net beneficial" and "systematic reviews . . . are consistent with long-term adult studies," which "failed to show credible improvements in mental health" and instead "suggested a pattern of treatment-associated harms." Stephen B. Levine & E. Abbruzzese, *Current Concerns About Gender-Affirming Therapy in Adolescents*, *in* 15 CURRENT SEXUAL HEALTH REPS. 113, 113 (2023), https://link.springer.com/article/10.1007/s11930-023-00358-x. This betrays the notion that a health care provider could validly facilitate the exact practices that, in the context of medical professionals, "would independently justify liability and revocation of one's . . . license." Tex. Att'y Gen. Op. No. KP-0481 (2025) at 4 (rejecting any "valid medical purpose" under the Education Code's exception for student athletes).

Indeed, we have made clear that "[a]ny person that . . . *facilitates* these procedures or treatments could be engaged in child abuse, whether that be parents, doctors, counselors, etc.," and "the failure to stop a doctor or another parent from conducting these treatments [or] procedures on a minor child can" prove similarly. Tex. Att'y Gen. Op. No. KP-0401 (2022) at 12 (emphasis added); *accord* Tex. Att'y Gen. Op. No. KP-0481 (2025) at 4–5. Texas law also compels reporting by professionals—*i.e.*, "an individual who is licensed . . . by the state" and "in the normal course of official duties for which [that] license . . . is required, has direct contact with children," TEX. FAM. CODE § 261.101(b)—with reasonable cause to believe a child has been or may be abused.[8] *Id.* § 261.101(a)–(b); *see also id.* § 261.109(a-1) (establishing an offense for the knowing failure to make such reports). As such, health care providers who are criminally convicted for these offenses would necessarily invite revocation of their licenses by the Council. *See* TEX. OCC. CODE § 53.021; *see also, e.g.*, 22 TEX. ADMIN. CODE §§ 463.40(7)–(8), (12) (criminal convictions, psychologists), 681.164(a)(7)–(8), (12) (criminal convictions, professional counselors), 781.420(7)–(8), (12) (criminal convictions, social workers), 801.206(7)–(8), (12) (criminal convictions, marriage and family therapists), 882.42(a)(3) (general ineligibility due to criminal history).

---

[8] The Third Court of Appeals upheld a temporary injunction generally involving reporting and the Department of Family and Protective Services' authority to investigate alleged child abuse related to "gender affirming" treatments. *Abbott v. Doe*, 691 S.W.3d 55, 93 (Tex. App.—Austin 2024, pet. filed); *see also Muth v. Voe*, 691 S.W.3d 93, 138 (Tex. App.—Austin 2024, pet. filed) (upholding a similar temporary injunction). But petitions on the validity of these temporary injunctions are pending before the Texas Supreme Court. *Abbott v. Doe*, Docket No. 24-0385 (Tex.); *Muth v. Voe*, Docket Nos. 24-0384, 24-0387 (Tex.). We therefore decline comment on this ongoing litigation. *See* Tex. Att'y Gen. Op. No. KP-0468 (2024) at 2.

**S U M M A R Y**

The definition of a "health care provider" in subsection 161.701(2) of the Health and Safety Code unambiguously encompasses the professions regulated by the Texas Behavioral Health Executive Council. Any licensee that facilitates the provision of unlawful procedures or treatments that aim to transition a child's sex are thus forbidden from receiving public money in support of those efforts and, separately, risk revocation of their licenses to practice.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

JOSHUA C. FIVESON
Chair, Opinion Committee

AMANDA K. ROMENESKO
Assistant Attorney General, Opinion Committee